**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
)
**DANILO LOPES,**                                          )
)
      **Plaintiff,**                                    )
)
      **v.**                                            )      **Civil Action No. 11-12063-DJC**
)
**JOHN BELAND et al.,**                                    )
)
      **Defendants.**                                  )
_____)

**MEMORANDUM OF DECISION**

**August 4, 2016**

## I.   INTRODUCTION

Plaintiff Danilo Lopes ("Lopes"), a Massachusetts Department of Corrections ("DOC") inmate, has brought state and federal constitutional claims against Carol H. O'Brien, Lawrence M. Weiner, Lisa A. Mitchell, Scott E. Anderson, Thomas E. Dickhaut, Anthony M. Mendonsa and Thomas M. Tocci, the remaining parties with claims against them (collectively, "Defendants"). The Court held a bench trial over the course of three days and has now received and considered the parties' proposed findings of facts and conclusions of law, D. 237, 243.  Although the DOC has voluntarily and wisely adopted the core relief that Lopes seeks in this lawsuit—namely, his assignment to a single-bunked cell—the Court does not conclude that Lopes is entitled to such relief as a matter of law or that the Defendants' failure to grant such relief earlier constituted cruel and unusual punishment in violation of the Eighth Amendment or a violation of due process in violation of the Fourteenth Amendment or the Massachusetts Declaration of Rights.  Accordingly,

1

the Court now issues its findings of facts and conclusions of law and enters judgment in favor of Defendants.

## II.     PROCEDURAL HISTORY

Lopes began this lawsuit on November 17, 2011. D. 1.  On October 1, 2012, Lopes filed the operative complaint, his second amended complaint.  D. 54.  Counts I and II are substantive due process claims under the Fourteenth Amendment and the Massachusetts Declaration of Rights, respectively.  Id. ¶¶ 70-77.  Counts III and IV are procedural due process claims under the Fourteenth Amendment and the Massachusetts Declaration of Rights, respectively.  Id. ¶¶ 78-83. Count V alleges a deliberate indifference claim under the Eighth Amendment.  Id. ¶¶ 84-87.  On November 30, 2012, Defendants moved to dismiss the operative complaint for failure to state a claim and failure to exhaust administrative remedies.  D. 79.  On April 5, 2013, the Court converted the Defendants' motion into a motion for summary judgment only on the issue of exhaustion.  D. 91.  On March 29, 2014, the Court denied Defendants' summary judgment motion on exhaustion grounds, denied Defendants' motion to dismiss against Counts I-V but allowed their motion to dismiss Count VI, an Americans with Disabilities Act claim.[1]  D. 111.

Over the course of three days, the Court held a bench trial on the remaining claims.  D. 221, 222, 227.  On the last day of trial, three of the Defendants requested that the Court enter judgment as a matter of law on partial findings, but the Court reserved ruling on the motion.  D. 226, D. 235 at 61:6-22.  Both parties, after the trial, filed proposed findings of fact and conclusions of law, D. 237, 243.

---

[1] Separately, the Court allowed a summary judgment motion brought by MHM Correctional Services, Inc., George D. Johns, Joel T. Andrade, Donald J. Hager, and John Beland.  D. 92, D. 111.

## III.    FINDINGS OF FACT

In light of the evidence presented at the bench trial, the Court makes the following findings of fact:

### A.    The Parties and Witnesses

1.      Lopes is an inmate lawfully incarcerated at Old Colony Correctional Center ("OCCC").  D. 54 ¶ 1; D. 230 at 77:1-2.[2]

2.      Defendant Carol H. O'Brien is the DOC Commissioner and sued in her official capacity.  D. 157.  She replaced former Commissioner Luis Spencer, who was named in Lopes's operative complaint.  D. 54 ¶ 2.

3.      Defendant Lisa Mitchell ("Mitchell") is Superintendent of OCCC.  D. 231 at 82:21-83:1.

4.      Defendant Thomas Dickhaut ("Dickhaut") was Superintendent of the Souza Baranowski Correctional Center ("SBCC") from May 2007 until September 2011.  D. 235 at 34:7-17.

5.      Defendant Anthony Mendonsa ("Mendonsa") was the Deputy Superintendent of Classification and Programs at SBCC from 2005 to 2011.  D. 231 at 47:15-17.

6.      Defendant Thomas Tocci ("Tocci") is the Institutional Grievance Coordinator at SBCC and is responsible for investigating and resolving grievances filed by SBCC inmates.  D. 235 at 5:18-20, 18:8-12.

7.      Defendant Scott Anderson ("Anderson") was the Deputy Superintendent of Classification and Programs at the Massachusetts Correctional Institution at Shirley ("MCI-

---

[2] Page and line citations to D. 230, D. 231 and D. 235 are citations to the July 30, July 31 and August 13, 2015 transcripts of the bench trial, respectively.

Shirley") from June 2005 to September 2011.  D. 231 at 38:8-13.  He was also Acting Superintendent from January until September 2011.  Id. at 40:25-41:1.

8.      Defendant Lawrence Weiner ("Weiner") was the Assistant Deputy Commissioner of Clinical Services from 2011 to 2013.  Id. at 147:19-22.

9.      Donald J. Hager ("Hager") works as Regional Mental Health Director for the Massachusetts Partnership for Correctional Healthcare (the contracted healthcare provider for the DOC) at SBCC.  D. 230 at 116:15-25, 119:21-120:9.  He is a licensed mental health counselor. Id. at 120:10-13.

10.     Mitzi Peterson ("Peterson") is Regional Administrator for the Health Services Division of the Department of Corrections.  Id. at 148:4-12.  During the relevant time period, she was the Clinical Director at OCCC, where she oversaw and supervised clinical staff.  Id. at 148:16-24.  She is a licensed independent clinical social worker.  Id. at 152:24-25.

11.     At the bench trial, the Court heard testimony from Lopes, D. 230 at 22, Hager, id. at 116, Peterson, id. at 148, Anderson, D. 231 at 38, Mendonsa, id. at 47, Mitchell, id. at 83, Weiner, id. at 147, Tocci, D. 235 at 5 and Dickhaut, id. at 24.  The Court has considered this testimony along with the exhibits admitted at trial.

## B.      SBCC and OCCC

12.     SBCC is the only maximum-security correctional facility in the Commonwealth. D. 231 at 50:12-15; D. 235 at 38:14-18.  Because the DOC designated SBCC as the sole maximum-security facility in 2008, SBCC became a double-bunked facility to allow for the housing of other maximum-security inmates originally housed elsewhere.  D. 231 at 50:10-17; D. 235 at 41:10-42:21.  SBCC currently contains both double-bunked (i.e., two inmates to a cell) and single-bunked (i.e., one inmate to a cell) cells.  D. 231 at 61:20-62:5.

13.     OCCC is a medium-security correctional facility that houses approximately 1,000 inmates.  Id. at 100:12-13.  In 2010, OCCC transformed from a general population correctional facility to one that specialized in the treatment of mentally ill inmates.  Id. at 100:19-101:2.  OCCC was originally all single-bunked cells, but because of overcrowding, now has double-bunked cells as well.  Id. at 102:8-11.

**C.     February 2005 to May 2009: Lopes at SBCC**

14.     Lopes was sentenced in February 2005.  D. 230 at 27:18.  He was initially housed at the Massachusetts Correctional Institution at Concord ("MCI-Concord").  Id. at 27:25-28:1.

15.     The Inmate Management System ("IMS") is the DOC electronic system that relays information to correctional and vendor staff.  D. 230 at 117:16-22; D. 231 at 84:2-5.  An IMS printout shows that on February 23, 2005, a medical restriction for a single room was entered for Lopes.  Defendants' Exhibit 1.  A comment on the printout stated:  "Patient requires single room only because of history of childhood trauma and paranoia."  Id.; D. 230 at 141:7-142:4; D. 235 at 63:4-10.

16.     Lopes testified about sexual assault that he suffered as a youngster, D. 230 at 22-23, and when detained in Plymouth when he was 19 years old.  Id. at 24.

17.     On February 24, 2005, Lopes was transferred to SBCC.  D. 231 at 67:14-18; D. 235 at 67:3-4.  As part of Lopes's SBCC intake, a correctional offer prepared an intake sheet.  D. 231 at 66:21-67:11.  At the time, Lopes claimed no medical or mental health issues.  Defendants' Exhibit 3; D. 231 at 67:19-25.  According to his orientation checklist (documenting that an inmate has received the inmate handbook explaining the rules and regulations of the facility, that he has been advised by medical and mental health staff on how to get healthcare within the facility and that the inmate has advised staff whether he can reside in general population safely without fear), Defendants' Exhibit 4; D. 231 at 68:11-19, Lopes acknowledged that he was advised about access

to healthcare.  Defendants' Exhibit 4; D. 231 at 68:22-69:1.  Lopes also claimed at the time of his intake that he was not in fear for his safety and requested to be placed in the general population. Defendants' Exhibit 4; D. 231 at 69:2-4.

18.     During his time at SBCC, Lopes remained in a single cell.  D. 230 at 29:9-11; D. 231 at 49:2-4.  Because of Lopes's seniority and the lack of disciplinary reports in his record, Lopes remained in a single cell even as SBCC began double bunking inmates to accommodate the arrival of new inmates.  D. 231 at 49:4-10.

### D.     May 2009 to May 2011: Lopes at MCI-Shirley

19.     In May 2009, the DOC transferred Lopes to MCI-Shirley.  D. 230 at 31:1-3.  As part of his intake there, Lopes signed an inmate waiver form.  Defendants' Exhibit 5; D. 230 at 106:4-15.  According to this form, Lopes indicated that he wished to be placed or remain in the general population at MCI-Shirley and that any and all past problems that he may have had with other inmates had been resolved.  Defendants' Exhibit 5; D. 230 at 106:13-25.

20.      From May 1, 2009 until February 10, 2011, Lopes was housed in a cell together with a succession of cellmates.  D. 230 at 81:3-83:24.  Although he was double-bunked during this period, he had no attempted suicides or any disciplinary report for fighting with his cellmates.  Id. at 85:8-14.

21.     On February 11, 2011, Lopes received a disciplinary report.  Id. at 85:16-19, 86:4-7.  The report stated that he possessed a bent four-inch frame nail in his shoe and charged him with possession of a weapon and possession of a tool.  Defendants' Exhibit 20; D. 230 at 86:8-14.  As a result, Lopes was transferred to the Special Management Unit ("SMU"), also known as segregation.  D. 230 at 32:9-33:13; D. 231 at 106:9-107:4.  On March 4, 2011, Lopes pled guilty to possessing a tool.  D. 230 at 87:20-25.

22.     Around this time, Lopes also had a letter written on his behalf sent to the superintendent requesting a single cell.  Defendants' Exhibit 9; D. 230 at 33:17-19, 112:7-9.  Lopes did not cite his mental health or any history of sexual assault or trauma for this request  Defendants' Exhibit 9; D. 230 at 112:16-113:3.  Instead, Lopes's letter sought a single cell because "I'm not a troublemaker and I stay by myself of the last 19 months.  I've dealt with cellmates who want to look for trouble.  I've had seven cellmates since I've been here.  I have issues with living with people.  I just want to do my time with no problems.  I'm asking for a single. I have a lot of time to do."  Defendants' Exhibit 9; D. 230 at 113:4-9.

23.     On March 25, 2011, Anderson responded to Lopes's letter.  Defendants' Exhibit 10.  The letter states:  "Be advised you are currently pending discipline for refusing to return to general population.  Additionally, single cells are obtained through seniority within the unit."  Id.; D. 230 at 113:13-19.  Anderson testified that Lopes's letter gave him no reason to believe that Lopes sought a single cell for mental health reasons.  D. 231 at 41:10-13.

### May 2011 to January 2012: Two Suicide Attempts at SBCC

24.     Approximately two months later, on May 26, 2011, the DOC transferred Lopes back to SBCC.  Defendants' Exhibit 8; D. 231 at 70:8-9.  The intake sheet at the time of Lopes's transfer indicated that there was no documented history of vulnerabilities or tendencies of acting out with sexually aggressive behavior or a history that identified the inmate as at risk for sexual victimization.  Defendants' Exhibit 8; D. 231 at 71:24-72:6.  According to the intake sheet, Lopes was not considered an open mental health case.  Defendants' Exhibit 8; D. 231 at 72:15-23.

25.     Again during this intake process, Lopes did not indicate that he was not in fear for his safety, requested to be placed in general population and indicated that he was advised of the sick call procedures.  Defendants' Exhibit 7; D. 230 at 108:7-22; D. 231 at 72:24-73:7.

26.     Initially, Lopes was scheduled to be transferred to an orientation unit at SBCC. Because, however, he refused to speak with mental health staff and refused to tell them that he would not harm himself, he was placed on mental health watch and sent to the Health Services Unit ("HSU") at the facility.  D. 231 at 73:12-16, 81:17-82:1; D. 235 at 50:19-51:8; D. 230 at 128:20-24.

27.     While Lopes was on watch, a mental health clinician spoke with him every day.  Id. at 36:24-37:2.  Lopes went on a hunger strike, although once he received an IV, he began to eat. Id. at 38:7-12, 38:22-39:2; D. 231 at 74:8-11.  He also received disciplinary reports for his refusal to be transferred from the HSU to an orientation unit.  D. 230 at 40:2-3; D. 231 at 74:11-13.

28.     A few weeks later, on June 9, 2011, Lopes agreed to be transferred out of the HSU to an orientation unit.  D. 231 at 74:14-21.  The purpose of housing an inmate in an orientation unit is to assess inmate adjustment to the facility.  Id. at 75:8-15.

29.     On June 22, 2011, Lopes was transferred from an orientation unit to a transition unit because he refused to accept a cellmate.  Id. at 76:1-3.  A transition unit is for inmates whose comportment does not warrant entry to the general population but also does not warrant segregation.  Id. at 76:4-7.  The goal of the transition unit is to place an inmate with some unit restrictions, get them to comply with the facility's rules and regulations and then integrate them into the general population.  Id. at 57:5-12.

30.     During his time in the transition unit, Lopes wrote a letter to Mendonsa requesting a single cell for mental health reasons.  In his response, Mendonsa indicated that he had forwarded Lopes's request to the mental health division.  Plaintiff's Exhibit 2; D. 230 at 43:24-44:4.

31.     On July 15, 2011, Lopes was placed back on mental health watch and transferred to the HSU.  Id. at 44:24-45:12; D. 231 at 76:9-14.

32.     In August 2011, while in a single cell in the HSU, Lopes attempted suicide by hanging himself in the shower.  D. 231 at 76:15-20.  The suicide attempt did not require Lopes to be hospitalized.  Id. at 76:23-25.

33.     During this time, Mendonsa spoke with Lopes.  Mendonsa stated that his only choice was to transfer Lopes to K-1, a unit with no double-bunked cells and where Lopes had no active enemies, even though Lopes had not finished the orientation process, the normal prerequisite.  D. 230 at 47:3-9, 51:4-8; D. 231 at 77:1-13.  Lopes agreed to the change and was transferred from the HSU to K-1 on August 17, 2011.  D. 231 at 77:10-13.

34.     At the time, K-1 was also being refitted to be a Residential Treatment Unit ("RTU"), a unit to provide qualifying inmates with enhanced mental health services to reduce self-injurious behavior, to get them acclimated to the facility and to work toward assimilation with the general population.  Id. at 77:14, 111:1-9.

35.     On September 29, 2011, because Lopes did not qualify for the RTU, he was transferred to G-1, id. at 77:11-17, but his stay there lasted less than a day because he refused to double bunk.  Id. at 77:18-20.  As a result, Lopes returned to a transition unit.  Id. at 52:23-25; D. 231 at 77:20.

36.     On October 11, 2011, DOC designated Lopes as an open mental health case. Plaintiff's Exhibit 6; D. 230 at 132:15-22.  His score was "MH-3," which meant he was at a moderate level of mental health treatment needs and seen by a mental health clinician at least once a month.  Plaintiff's Exhibit 6; D. 230 at 131:14-132:10.  Lopes's score also contained two subcodes: (1) "B," which indicated that he had been prescribed medication and (2) "D," which indicated that he had a history of self-injury.  Plaintiff's Exhibit 6; D. 230 at 132:11-14.

37.     On October 13, 2011, Lopes submitted a mental health grievance.  Defendant's Exhibit 12; D. 230 at 136:7-12.  Lopes requested a mental health order for a single bunk.

Defendant's Exhibit 12; D. 230 at 136:15-17.  Lopes's request was denied by the mental health director, and Hager, as the grievance and appeal coordinator, was copied on the response. Defendant's Exhibit 13; D. 230 at 136:22-137:4.

38.     A short time later, on November 1, 2011, Lopes filed an inmate grievance form, again seeking a single cell.  Defendants' Exhibit 11; D. 235 at 20:25-21:5.  Tocci received the grievance.  D. 235 at 20:16-24.  To investigate Lopes's claim, Tocci spoke with the assignment officer at SBCC, who told him that Lopes was not on single cell status.  Id. at 15:14-23, 16:1-8, 21:8-11.  Tocci also conferred with Lopes's primary care clinician.  Id. at 21:18-20, 14:24-15:10; id. at 16:19-25, 21:18-25.

39.     As a result, Tocci denied Lopes's inmate grievance form and Lopes never appealed it.  Id. at 22:1-12.

40.     Lopes, however, did appeal his mental health grievance.  Defendants' Exhibit 14; D. 230 at 137:16-138:2.

41.     While considering Lopes's appeal, Hager discovered that an incomplete medical restriction for a single cell had been entered into IMS back in 2005.  D. 230 at 140:3-6.  The restriction was incomplete because it did not comply with the medical restriction process.  Id. at 118:1-21.  The process requires that a clinician complete a form explaining the justification for the medical restriction.  Id.  The form then must be approved by both the health service administrator and the deputy of treatment and classification at the inmate's facility.  Id.  Once their approvals are obtained, the clinician can enter the restriction into IMS.  Id.  A restriction comes with a start date, a review date, comments or explanations and a check box to indicate whether the restriction should be indefinite.  Id.

42.     Lopes's file did not contain a medical restriction form or any other documentary support for the 2005 IMS entry.  Id. at 140:17-19; D. 235 at 64:8-14; D. 230 at 142:8-20; D. 235 at 65:12-66:4.

43.     After review of the appeal, Hager upheld the original grievance decision. Defendants' Exhibit 15; D. 230 at 138:14-15.  In so doing, Hager explained that Lopes's 2005 single cell medical restriction was incomplete.  D. 230 at 138:17-19.  He also explained that Lopes's history of self-injury weighed against placing him alone in a cell.  Id. at 138:20-139:5. Hager's decision was based on his suicide prevention training, twenty years of experience as a crisis counselor and data and reference textbooks on the subject.  Id. at 139:6-14.

44.     Before Hager responded to Lopes's appeal, on January 10, 2012, Lopes attempted suicide.  Id. at 133:7-14; D. 231 at 78:5-8.  Lopes made a rope and attempted to break his neck. D. 230 at 56:20-57:7.  This suicide attempt required Lopes's hospitalization in an outside hospital for several hours.  D. 230 at 57:11-12, 133:14-15.  Upon Lopes's return to SBCC, clinicians ordered him to be placed on watch in the HSU.  D. 231 at 78:23-24.

**E.      January 2012 to September 2012:  Suicide Attempt at BSH**

45.     The next day, on January 11, 2012 clinicians petitioned for Lopes to be committed to Bridgewater State Hospital ("BSH").  D. 230 at 134:2-22; D. 231 at 78:13-16.  A judge granted the petition and Lopes was transferred from SBCC to BSH the same day.  D. 231 at 78:13-16.

46.     Lopes never returned to SBCC.  Id. at 79:3-5; D. 230 at 134:13-16.  During his time at SBCC, Lopes was never forcibly double bunked at any time.  D. 231 at 78:1-4.

47.     In June or July 2012, while at BSH, Lopes attempted to hang himself while housed in a single cell.  D. 230 at 66:2-7, 67:2-5, 96:3-18.  As a result, Lopes was placed on mental health watch for approximately two days.  Id. at 66:20-21.

48.     On August 30, 2012, BSH clinicians authored a discharge summary for Lopes. Plaintiff's Exhibit 7.  The summary states that Lopes "has been approved for the RTU" and will be transferred to OCCC.  Id.  "Single room requirement/request persists by the Bridgewater State Hospital clinical team and it is highly recommended that he be placed in a single room for success in the RTU program."  Id.

49.     Before Lopes's transfer to OCCC, the OCCC clinical team discussed Lopes with the BSH medical team on a conference call.  D. 231 at 10:10-21, 112:23-115:3; D. 235 at 67:15-25.  The participants discussed Lopes's previous suicide attempts and the BSH's recommendation that Lopes be housed in a single cell.  D. 231 at 10:22-11:3, 113:4-17.

50.     On the call, Peterson expressed her concern about putting Lopes in a single cell. Id. at 113:21-114:2.  Peterson had reviewed Lopes's history, which showed that Lopes had twice attempted suicide while in a single cell but made no such attempt when housed with a cellmate. Id. at 12:5-9, 113:21-114:2.  Based on Peterson's experience, the risk of inmate suicide is increased by suicidal ideation, single-cell status, mental health issues, depressive issues, access to means, and time of day.  Id. at 15:18-16:1.  Peterson's clinical opinion was that the privacy a single cell afforded placed Lopes at a higher risk of self-harm.  Id. at 14:22-15:1, 16:2-8.

51.     Based on the discussion on the call, the clinicians reached a consensus that a single cell order was not "clinically indicated" for Lopes.  Id. at 12:7-16, 113:16-114:13; D. 235 at 68:1-9.  Peterson and Mitchell were both told that BSH staff informed Lopes that he would not be receiving a single cell at OCCC.  D. 231 at 17:2-6, 115:10-17.

## F.     Since September 2012: Suicide Attempt at OCCC

52.     On September 6, 2012, Lopes transferred to OCCC.  Id. at 17:19, 115:19-21.  When Lopes saw that he had cellmate, he refused to enter the cell.  D. 230 at 68:3-21, 96:22-97:1.  An officer checked the computer and informed Lopes that he did not have a single cell order.  Id. at

68:22-69:1.  After approximately forty-five minutes of trying to convince Lopes to enter his cell, Lopes and the officers agreed that Lopes would be placed on mental health watch in the SMU.  Id. at 69:14-18.

53.     The DOC issued a disciplinary report to Lopes on September 7, 2012.  Plaintiff's Exhibit 10.  Under the practice at the time, mental health staff reviewed all disciplinary reports before they were issued to inmates and the mental health staff closed and dismissed the report only if mental illness played a role in the conduct underlying the offense.  D. 231 at 131:3-18.

54.     On September 10, 2012, Ms. Peterson entered an end date for the 2015 IMS restriction, adding the comment: "Single cell requirement [d]iscontinued on 9/6/12 upon transfer to OCCC from BSH, after consultation with BSH staff."  Defendants' Exhibit 1; D. 235 at 68:15-22.

55.     On September 11, 2012, the DOC issued another disciplinary report to Lopes for his failure to move from the SMU to the RTU.  Plaintiff's Exhibit 10; D. 230 at 69:22-23.

56.     The next day, Lopes threatened to jump from the sink in his cell.  D. 231 at 22:13-15.  Peterson evaluated him and put him on mental health watch.  Id. at 22:15-20.  As part of the evaluation, she evaluated Lopes's historical, clinical and situational risk factors.  Defendants' Exhibit 22; D. 231 at 23:3-14.

57.     Lopes's threat did not change Peterson's clinical opinion that Lopes should not have a single cell.  D. 231 at 25:23-26:1.  Peterson believed that because Lopes's threat to jump from a sink was not lethal, Lopes was motivated by his desire to get a single cell rather than by mental illness.  Id. at 25:15-21.  Peterson also believed that Lopes's behavior was not due to mental illness because his threats changed from hurting himself to hurting others if placed in a double cell.  Id. at 26:7-14.  Mental health watch discontinued for Lopes on September 14, 2012.  Id. at 27:5-6.

58.     On September 20, 2012, Peterson, Mitchell and other OCCC staff had a meeting where they discussed Lopes.  Id. at 128:13-129:8.  They continued to discuss the single cell issue and how Lopes did not clinically qualify for one.  Defendants' Exhibits 16; D. 231 at 129:12-16.

59.     That same day, Mitchell denied Lopes's appeal of one of the disciplinary reports.  Plaintiff's Exhibit 10; D. 231 at 135:20-22, 138:4-8.  In the appeal, Lopes had stated that he had suffered sexual abuse in a double-bunked cell.  Plaintiff's Exhibit 10; D. 231 at 133:1-4.  Mitchell had her staff look into Lopes's new allegation of sexual abuse, D. 231 at 134:3-10, but they were unable to substantiate Lopes's allegation.  Id. at 134:6-10.

60.     While at SMU, mental health clinicians visited Lopes six days a week.  Id. at 27:10-14.  Lopes repeatedly told clinicians that he was safer in a single-bunked cell in the SMU than in a double-bunked cell in the RTU.  D. 230 at 98:6-21, 103:21-25; D. 231 at 29:23-30:1, 30:15-22.

61.     On October 1, 2012, Lopes attempted to commit suicide by hanging in his single cell in the SMU.  D. 231 at 30:2-6, 139:15-17; D. 230 at 71:12-14, 95:20-96:1.  Lopes's attempt was at 11:21 a.m., just before a major prisoner count at 11:25 a.m. and during the time that meals are being brought down to the unit.  D. 231 at 30:7-14, 141:15-24.

62.     Lopes was taken to Morton Hospital, where he remained for over a week, until October 9, 2012.  D. 230 at 72:3-4; D. 231 at 143:10-11.  Following his discharge from Morton Hospital, Lopes returned to OCCC for the night.  D. 231 at 143:24-144:9.  On October 10, 2012, Lopes was transferred to BSH.  Id. at 32:10-13, 144:2-9.

63.     On November 9, 2012, clinical staff at OCCC and BSH discussed Lopes.  D. 235 at 69:5-25.  By that time, BSH clinical staff had assessed that Lopes's suicide attempt was not the product of mental illness.  Id. at 70:16-71:5.  They, however, arrived at the consensus that because the suicide attempt was so significant and that Lopes had demonstrated he was willing to go to almost any length, they would put him in a single cell in the RTU.  Id. at 70:1-71:5.

14

64.     On November 9, 2012, the mental health director at OCCC entered a single-cell restriction for Lopes in IMS.  Defendants' Exhibit 1; D. 235 at 69:2-12.

65.     Mitchell, the OCCC Superintendent, does not have the authority to disregard this order.  D. 231 at 145:5-7.  The order is the result of a clinical process in which she has no involvement.  Id. at 145:11-21.  A mental health order for a single cell, such as the one Lopes received on November 9, 2012 and which remains in place, cannot be made or discontinued absent a consensus decision of the facility's mental health team and the approval of the highest ranking officials for the mental health vendor in the state.  D. 230 at 145:13-146:9; D. 231 at 36:4-12.

66.     On May 20, 2013, Lopes was discharged from BSH and transferred to OCCC.  D. 230 at 75:5-8.  Since that date, Lopes has been housed in a single-bunked cell.  D. 231 at 145:25-146:4.

## IV.     CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

### A.     Defendants are Entitled to Judgment on Lopes's Eighth Amendment and Substantive Due Process Claims

1.     In his complaint, Lopes alleges that Defendants violated the Eighth Amendment because their actions subjected him to wanton and unnecessary infliction of pain (Count V).[3]  D. 54 ¶¶ 84-87.  To succeed, Lopes must demonstrate that Defendants have acted with "deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).

2.     This standard contains both objective and subjective inquiries.  Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011).  For the objective inquiry, Lopes must show

---

[3] Lopes also alleges that this conduct violates the Fourteenth Amendment.  D. 54 ¶¶ 84-87.  That makes no difference here.  "A 'deliberate indifference' claim is based on the Eighth Amendment, which applies against the states through the Fourteenth Amendment."  Rua v. Glodis, 52 F. Supp. 3d 84, 95 n.5 (D. Mass. 2014).

"proof of a serious medical need." Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014). A medical need is serious "if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Leavitt, 645 F.3d at 497 (quoting Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990)) (internal quotation mark omitted). For the subjective injury, Lopes must show that the prison official knew that Lopes "face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994).

3.      Deliberate indifference is a high bar. It refers to a "narrow band of conduct," where the care provided "must have been so inadequate as to shock the conscience." Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 162 (1st Cir. 2006) (citations and internal quotation marks omitted). Substandard care, "even to the point of malpractice," is not enough. Id. (citation omitted). Instead, the treatment provided "must have been so inadequate" that it constitutes "an unnecessary and wanton infliction of pain" or is "repugnant to the conscience of mankind." Leavitt, 645 F.3d at 497 (citation and internal quotation marks omitted).

4.      "Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice." Jackson v. Fair, 846 F.2d 811, 817 (1st Cir. 1988). "[A] claim of inadequate medical treatment which reflects no more than a disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment." DesRosiers v. Moran, 949 F.2d 15, 20 (1st Cir. 1991).

5.      "In a suicide case, a finding of deliberate indifference requires a strong likelihood, rather than a mere possibility, that self-infliction of harm will occur." Penn v. Escorsio, 764 F.3d

102, 110 (1st Cir. 2014) (quoting <u>Elliott v. Cheshire Cty.</u>, 940 F.2d 7, 10 (1st Cir. 1991)).  The

conduct "must encompass acts or omissions so dangerous (in respect to health and safety) that a

defendant's knowledge of a large risk can be inferred."  <u>Id.</u> (quoting <u>Elliott</u>, 940 F.2d at 10).

6.     Lopes also alleges substantive due process claims under the Fourteenth

Amendment (Count I) and the Massachusetts Declaration of Rights (Count II).  D. 54 ¶¶ 70-77.

7.     Where a constitutional claim is "covered by a specific constitutional provision, such

as the . . . Eighth Amendment, the claim must be analyzed under the standard appropriate to that

specific provision, not under the rubric of substantive due process."  <u>United States v. Lanier</u>, 520

U.S. 259, 272 n.7 (1997); <u>see</u> <u>Whitley v. Abers</u>, 475 U.S. 312, 327 (1986) (holding that the Due

Process Clause affords "no greater protection than does the Cruel and Unusual Punishments

Clause" to a prisoner who alleged that prison officials subjected him to cruel and unusual

punishment by shooting him while trying to quell a prison riot).

8.     "In the context of substantive due process, the Massachusetts Declaration of Rights

at times provides greater substantive due process protections."  <u>Christensen v. Kingston Sch.</u>

<u>Comm.</u>, 360 F. Supp. 2d 212, 215 n.1 (D. Mass. 2005).  But where, as here, a plaintiff does not

argue that the Declaration of Rights affords him greater protection, the claims are treated

identically.  <u>Id.</u>; <u>see</u> <u>Gillespie v. City of Northampton</u>, 460 Mass. 148, 153 n.12 (2011) (noting that

"[a]lthough art. 10 [of the Massachusetts Declaration of Rights] may afford greater protection of

rights than the due process clause of the Fourteenth Amendment [to the United States

Constitution], our treatment of due process challenges adheres to the same standards followed in

Federal due process analysis") (internal quotation marks and citation omitted); <u>Hudson v. Comm'r</u>

<u>of Corr.</u>, 46 Mass. App. Ct. 538, 543 (1999) (noting that the Supreme Judicial Court has

"consistently equated" the due process provisions of the Massachusetts Declaration of Rights and

the Due Process Clause under the Fourteenth Amendment "as comparable, both generally and in the prison environment"). In any event, "[t]he rights guaranteed under Art. 26 [of the Massachusetts Declaration of Rights] are as broad as those rights protected under the Eighth Amendment." Martin v. Clavin, No. 08-cv-11971-MBB, 2010 WL 3607079, at *7 (D. Mass. Sept. 9, 2010).

9. Because essentially identical standards apply to Lopes's Eighth Amendment claim and his federal and state substantive due process claims, the Court analyzes them under the deliberate indifference standard.

10. First, Lopes has not established the objective prong. None of the clinicians who testified at trial stated that Lopes required a single cell for his mental health. See, e.g., D. 230 at 138:14-139:14; D. 231 at 12:7-16, 113:16-114:13; D. 235 at 68:1-9. Instead, they consistently concluded that Lopes's self-injurious behavior did not warrant single-cell status because his suicide attempts were made only when he inhabited a single cell. See, e.g., Defendants' Exhibit 15; D. 231 at 12:5-9, 25:23-26:14, 113:21-114:2. Because the only medical opinions at trial were that Lopes's mental health did not mandate a single cell, Lopes cannot show that his need was "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Kosilek, 774 F.3d at 82 (citation and internal quotation marks omitted); see Perry v. Dickhaut, No. 11-cv-40004-TSH, 2015 WL 5074477, at *7 (D. Mass. Aug. 27, 2015).

11. Second, Lopes has not established the subjective prong. The evidence at trial made clear that a single-cell order based on mental health reasons could only be issued with the approval of mental health clinicians. Here, clinicians at SBCC (Hager) and OCCC (Peterson) were aware of Lopes's situation and his past suicide attempts, yet they did not recommend a single-cell order

until after his October 2012 suicide attempt.  As prison officials, Defendants were entitled to rely upon Hager's and Peterson's professional medical opinions.      See Rasheed v. Bissonnette, No. 14-cv-10378-FDS, 2015 WL 2226255, at *15 (D. Mass. May 12, 2015), appeal docketed, No. 15-1717 (1st Cir. 2015) (dismissing prisoner's complaint because "[h]ousing him in a double cell, after an independent mental-health examination concluded that his mental-health needs do not preclude double-bunking, does not constitute a deprivation so shocking as to create a constitutional violation"); Spencer v. Bender, No. 08-cv-11528-RGS, 2010 WL 972207, at *7 (D. Mass. Mar. 11, 2010) (noting that it is presumed within the prison setting that "non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care") (citation and internal quotation marks omitted).

12.     Moreover, when clinicians finally imposed a single-cell restriction for Lopes in November 2012, even though they did not believe his mental health necessitated it, Defendants honored the restriction.  Defendants' Exhibit 18; D. 231 at 36:14-20.  Defendants' conduct was thus not "so inadequate" that it "shock[s] the conscience."  Feeney, 464 F.3d at 162 (internal quotation marks omitted).

**B.     Defendants Are Entitled to Judgment on Lopes' Procedural Due Process Claims**

13.     Lopes also alleges procedural due process claims under the Fourteenth Amendment (Count III) and the Massachusetts Declaration of Rights (Count IV).  He alleges that Defendants have violated his due process rights because they "purported to remove [his] Single Cell Restriction without providing [him] notice and an opportunity for hearing."  D. 54 ¶¶ 78-83.

14.     "[A]s a general proposition, the federal and Massachusetts standards for a procedural due process analysis are identical."  Pollard v. Georgetown Sch. Dist., No. 14-cv-

14043-DJC, 2015 WL 5545061, at *6 (D. Mass. Sept. 17, 2015) (citation and internal quotation marks omitted).  The Court thus analyzes the procedural due process claims together.

15.     A procedural due process claim against the government requires "proof of inadequate procedures and an interference with a liberty or property interest." Restucci v. Clarke, 669 F. Supp. 2d 150, 157 (D. Mass. 2009) (citing Kentucky Dept. of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).  "The liberty interest of prisoners are limited to 'freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. (citing Sandin v. Conner, 515 U.S. 472, 484 (1995)).  An inmate's "subjective expectations are not dispositive of the liberty-interest analysis." Id. (citing Dominique v. Weld, 73 F.3d 1156, 1160 (1st Cir. 1996)).

16.     Lopes has not met his burden on his procedural due process claims.  First, Lopes has not established that his desire to avoid double bunking is a protected liberty interest.  Double bunking "is not a per se violation of due process." Cote v. Murphy, 152 F. App'x 6, 7 (1st Cir. 2005) (citing Bell v. Wolfish, 441 U.S. 520, 541-43 (1979)); Restucci, 669 F. Supp. 2d at 158 (noting there is "no constitutionally protected right to a single-cell").  Although the First Circuit has acknowledged that "in rare cases [double bunking] might amount to an unlawful practice when combined with other adverse conditions," Lopes established no such adverse conditions at trial. Cote, 152 F. App'x at 7.

17.     Second, even assuming that Lopes had a liberty interest in avoid double bunking, the "procedures attendant upon that deprivation were constitutionally sufficient." Harron v. Town of Franklin, 660 F.3d 531, 537 (1st Cir. 2011) (quoting Gonzalez-Fuentes v. Molina, 607 F.3d 864, 886 (1st Cir. 2010)) (internal quotation mark omitted).  Evidence at trial established that the 2005 IMS restriction was incomplete.  Defendants were entitled to remove that initial restriction

particularly where the evidence at trial about its medical necessity was scant.  See Cox v. Palmer, No. 3:08-cv-00663-ECR, 2011 WL 4344047, at *13 (D. Nev. July 27, 2011) (stating that "[p]laintiff was not entitled to any process before his single-cell status was revoked simply because he had been provided with single-cell status based on medical necessity in the past" and that "[t]his is true especially when [the] medical care providers indicated a single-cell was not medically necessary at the time period in issue").

## V.    CONCLUSION

In light of the findings of fact and conclusions of law, the Court enters judgment in favor of Defendants on all remaining counts.  Any injunctive and declaratory relief sought by Lopes is DENIED in light of the Court's decision.  The motion for judgment on partial findings, D. 226, is DENIED as moot.

**So ordered.**

/s/ Denise J. Casper
United States District Judge